540 A.2d 272

Floyd R. GANASSI and G. Gray Garland, Jr., Appellants,

v.

BUCHANAN INGERSOLL, P.C.; William Rankin Newlin; M. Bruce McCullough; Alexander & Green; Richard T. McDermott; David S. Pennock; Richard Uhl; and Pamela J. Giarla.

Superior Court of Pennsylvania.

Argued Dec. 8, 1987.

Filed March 25, 1988.

10

James A. Ashton, Pittsburgh, for appellants.

James D. Morton, Pittsburgh, for Ingersoll, Newlin, McCullough, Uhl and Giarla, appellees.

Frederick W. Bodd, III, Pittsburgh, for Alexander & Green and McDermott, appellees.

Before ROWLEY, TAMILIA and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the order of the Court of Common Pleas of Allegheny County granting the defendants' prelim-

inary objections in the nature of a demurrer to the plaintiffs' complaint. We affirm.

As is our function upon an appeal from a decision of the court below sustaining preliminary objections in the nature of a demurrer, we must accept as true every relevant fact sufficiently averred in the plaintiffs' complaint together with every inference favorable to the non-moving party which is fairly deducible therefrom. *Wojciechowski v. Murray*, 345 Pa.Super. 138, 497 A.2d 1342 (1985).

The complaint, viewed in light of the aforementioned, reveals that in 1975 the plaintiffs (Garland and Ganassi) acquired a controlling interest in FSC Corporation, a holding company incorporated under the laws of Delaware. Ultimately, Garland became Chief Executive Officer and Chairman of the Board of Directors and Ganassi rose to the level of Vice Chairman of the Board of Directors.

In 1981, it appears that FSC was experiencing financial difficulties. In an effort to aid the corporation, the plaintiffs agreed to sell a major portion of their interest in FSC to some investors known as the Portnoy Group. In exchange, the Portnoy Group agreed to infuse five to ten million dollars of new working capital into the corporation. As a part of the agreement, the plaintiffs elected the Portnoy Group to the Board of Directors, resigned their positions as officers and members of FSC and caused the resignation of the balance of the Board of Directors and senior management.

The Portnoy Group took over the management of FSC, the control of which lasted but ten days before it rescinded the agreement and advised the plaintiffs to resume their positions as members of the Board of Directors. In an effort to regain their positions with FSC, the plaintiffs consulted the defendant law firms, Alexander and Green and Buchanan Ingersoll,[1] who advised them that a share-

---

1. Save for Pamela J. Giarla (corporate counsel for FSC) and Richard Uhl (executive vice-president of FSC), the remaining defendants are members of the defendant law firms.

holders meeting and subsequent election were a condition precedent to resuming their posts with FSC.

Before any meeting could be conducted to reinstate the plaintiffs, FSC filed for bankruptcy under Chapter 11 with the United States Bankruptcy Court for the Western District of Pennsylvania. At that time, defendant Uhl, who was executive vice-president of FSC, was appointed by the Bankruptcy Court as responsible officer for the debtor corporation. Thereafter, according to the plaintiffs, it became evident that the defendants had no intention of including them in the operation of FSC, the substance of which took the form of a purported conspiracy on the part of the defendants to malign and defame the plaintiffs. More particularly, the plaintiffs formulated their allegations in a complaint filed December 5, 1984, the essence of which asserted that the defendants were accountable to them on grounds rooted in conspiracy (count I), fraud and deceit (count II), breach of contract (count III), defamation (count IV), libel (count V), invasion of privacy—false light (count VI), interference with prospective business or contractual relations (count VII) and intentional infliction of emotional distress (count VIII).

On February 2, 1987, the court below issued an order, the portion of which we need be concerned with relates to the sustaining of the defendants' preliminary objections in the nature of a demurrer to counts IV (defamation), V (libel) and VI (invasion of privacy—false light). No other aspect of the order has been appealed by the plaintiffs to this Court.[2]

2. Albeit not raised by any of the parties to the litigation or the court below, we deem it appropriate to observe that the order appealed is a final one and not interlocutory despite the fact that, as a general rule, an order dismissing some but not all counts of a multi-count complaint is interlocutory and not appealable. See *Praisner v. Stocker,* 313 Pa.Super. 332, 459 A.2d 1255 (1983). The reason we reach the conclusion we do is based upon the fact that the plaintiffs' complaint contains, in reality, separate causes of action. In this jurisdiction, an order dismissing one or more separate causes of action is appealable. See *Morrow v. Bell Telephone Co. of Pa.,* 330 Pa.Super. 276, 479 A.2d

■ The first issue we shall address concerns the claim that the defendants made false, defamatory and scandalous statements concerning the plaintiffs which were not rendered privileged because of the method and manner of their dissemination, i.e., through documents submitted during the course of the Chapter 11 proceeding.

In this Commonwealth, our Supreme Court has had occasion recently to crystalize those conditions which must exist for one's communications to be labelled privileged, and, thus, immune from suit; to-wit:

> The essential realm of protected communication ... has traditionally been regarded as composed only of those communications which are issued *in the regular course of judicial proceedings* and which are *pertinent and material to the redress or relief sought.*
>
> \* \* \* \* \* \*
>
> Whether a challenged communication is published prior to, or during, a judicial proceeding, it must bear a certain relationship to the proceeding so as to qualify it as privileged. That relationship is, in either case, the same.... [I]n reference to communications made during judicial proceedings, it is necessary that a protected communication have been pertinent and material to the redress sought and that the communication have been issued in the regular course of the proceedings. Similarly, with respect to communications made prior to the institution of proceedings, the protected communication would need to have been pertinent and material and would need to have been issued in the regular course of preparing for contemplated proceedings.

*Post v. Mendel,* 510 Pa. 213, 221 & 223, 507 A.2d 351, 355 & 356 (1986) (Emphasis in original; citations omitted).

Evaluated by the *Post* standard, we find that the allegedly false and defamatory statements contained in Exhibits A, B, C and D, attached to the plaintiffs' complaint and attributed to the defendants, are privileged as having been

548 (1984); see also *Feingold v. Hill,* 360 Pa.Super. 539, 521 A.2d 33 (1987).

made, as is even conceded by the plaintiffs at paragraph 65 of their complaint, at "the commencement of the FSC Chapter 11 case...."

To elucidate, Exhibit A is a letter from the defendant Buchanan Ingersoll to Judge Paul A. Simmons of the United States District Court for the Western District of Pennsylvania. The letter summarizes a reorganization plan contemplated by FSC. In the course of discussing the plan, its author makes reference to the plaintiffs; namely:

> Let me now turn to the "Shareholders' Outline of a Plan" submitted by The Official Committee of Equity Security Holders.... Of the six-page outline, better than half is taken up with the customary diatribe from the Equity Committee that weaves claims of "illegal freeze-out" with apologies for Messrs. Garland and Ganassi's abandonment of FSC in the fall of 1981. We submit that the presentation of FSC's outline of its proposed plan and its commitment to file its plan by September 24, no useful purpose would be served by reconstituting boards of directors for these Debtors and other subsidiaries of FSC. Indeed, the very limited resources of these Debtors should not be burdened further with fights over temporary seats on boards of directors. With the filing of the FSC plan all parties in interest will have an opportunity to be heard and through the processes of the Bankruptcy Code such objections as they may have will be dealt with. Further, we submit that this is not the place to argue over the actions and inactions of Messrs. Garland and Ganassi in their management of FSC and its subsidiaries. Rather, we simply note that they are the subject of a class action pending in this Court entitled *Joseph Ratner, et al. v. G. Gray Garland, et al.,* Index No. 81–1756, brought by the stockholders of FSC on behalf of a large class of purchasers of FSC common stock, many of whom are purportedly represented here by the Equity Committee, in which Messrs. Garland and Ganassi are alleged to have committed several serious violations of the Federal securities laws during their management tenure. The

FSC plan will propose that the interests of Messrs. Garland and Ganassi and the other two former members of FSC's board as stockholders of FSC be equitably subordinated under Section 510(c) of the Bankruptcy Code and that they receive nothing. At the plan hearings on this aspect of FSC's plan, their record as management will be thoroughly examined.

However, a few brief comments on the Equity Committee's so-called "plan" are in order. That "plan" contains something old and something new.

The "old" is the mysterious outside third party investor with the "enviable track record" ... who would invest in FSC provided "FSC is clear of any legal entanglements" ..., whatever that might mean, and we take it, provided Messrs. Garland and Ganassi are back on the board. Messrs. Garland and Gannassi [sic] have on repeated occasion [sic] said they could produce an investor, and they tell us they have found one. Yet they decline to tell Your Honor and to tell us who he is, what his financial resources are, or on what terms he proposes to invest.

Their scheme is nothing more than a rehash of what they proposed at the meeting with creditors and FSC on June 20, 1984—put them back in control of the board they abandoned and they will then disclose the identity of their mystery investor. Their "plan" speaks of an unnamed investor who is willing to buy an unstated number of FSC shares at an unstated price and who would merge his undisclosed businesses into FSC on unknown terms. This is exactly the type of loosely set deal Messrs. Garland and Ganassi arranged with the Portney–Powers group in September, 1981 that led directly to FSC's bankruptcy.

\* \* \* \* \* \*

In sum, the Equity Committee's "plan" is not a plan but a smokescreen thrown up in an effort to hide the attempt by Messrs. Garland and Ganassi to regain control of FSC. It brings forth the "old"—the mysterious investor, a Trojan horse as enshrouded today as he has been in the past, and it presents something "new"—a plan of

distribution which because it cannot be confirmed renders it a dead letter from the start.

To reiterate, instantly we have the commencement of bankruptcy proceedings by FSC. Thereafter, as documented in the letter denominated Exhibit A, the communique was prepared "in response to the suggestions ... made" by Judge Simmons at a conference regarding FSC's bankruptcy. Thus, the plan proposed by the defendants and their discussion of the plaintiffs' reorganization plan were matters germane to the bankruptcy proceedings. Further, the letter proffered a legal argument to the District Court and requested it to take a particular position in regard thereto. (See Exhibit A, reproduced in footnote 3.) [3]

**3.** Exhibit A reads in its entirety as follows:

Dear Judge Simmons:

We are co-counsel for Debtors, FSC Corporation ("FSC") and Funding Systems Asset Management Corp. ("FSAM"), retained by these Debtors to assist them, among other things, in the formulation, negotiation and implementation of plans of reorganization in their respective bankruptcy cases. In response to the suggestions you made at the June 29, 1984 conference regarding the captioned appeals, on behalf of FSC and FSAM we are enclosing a "Summary of Plan of Reorganization Contemplated by FSC Corporation", which as the title suggests sets out an outline of a plan which Debtor FSC intends to propose in its bankruptcy case.

In recognition of the conflicting interests of the creditors and other parties in interest of FSC, on the one hand, and its wholly owned subsidiary, FSAM, on the other, the FSC plan contemplates a global settlement between FSC and FSAM looking toward the confirmation of two separate plans for these Debtors.

The Summary was presented to the Unsecured Creditors' Committee at a meeting held on July 18, 1984 and that Committee agreed that the Debtor's proposals merit serious consideration. FSC intends to file a formal plan of reorganization containing the elements set forth in the Summary by September 24, 1984, the date when its exclusive period to file a plan under Section 1121 of the Bankruptcy Code as extended by Bankruptcy Judge Gibson will expire.

Let me now turn to the "Shareholders' Outline of a Plan" submitted by The Official Committee of Equity Security Holders with Mr. Tumolo's letter to you dated July 13, 1984. Of the six-page outline, better than half is taken up with the customary diatribe from the Equity Committee that weaves claims of "illegal freeze-out" with apologies for Messrs. Garland and Ganassi's abandonment of FSC in the fall of 1981. We submit that with the presentation of FSC's outline of its proposed plan and its committment to file its plan by September 24, no useful purpose would be served by reconstituting boards of directors for these Debtors and other subsi-

diaries of FSC. Indeed, the very limited resources of these Debtors should not be burdened further with fights over temporary seats on boards of directors. With the filing of the FSC plan all parties in interest will have an opportunity to be heard and through the processes of the Bankruptcy Code such objections as they may have will be dealt with. Further, we submit that this is not the place to argue over the actions and inactions of Messrs. Garland and Ganassi in their management of FSC and its subsidiaries. Rather, we simply note that they are the subject of a class action pending in this Court entitled *Joseph Ratner, et al. v. G. Gray Garland, et al.*, Index No. 81-1756, brought by stockholders of FSC on behalf of a large class of purchasers of FSC common stock, many of whom are purportedly represented here by the Equity Committee, in which Messrs. Garland and Ganassi are alleged to have committed several serious violations of the Federal securities laws during their management tenure. The FSC plan will propose that the interests of Messrs. Garland and Ganassi and the other two former members of FSC's board as stockholders of FSC be equitably subordinated under Section 510(c) of the Bankruptcy Code and that they receive nothing. At the plan hearings on this aspect of FSC's plan, their record as management will be thoroughly examined.

However, a few brief comments on the Equity Committee's so-called "plan" are in order. That "plan" contains something old and something new.

The "old" is the mysterious outside third party investor with the "enviable track record" (p. 4) who would invest in FSC provided "FSC is clear of any legal entanglements" (p. 5), whatever that might mean, and we take it, provided Messrs. Garland and Ganassi are back on the board. Messrs. Garland and Gannassi [sic] have on repeated occasion [sic] said they could produce an investor, and they tell us they have found one. Yet they decline to tell Your Honor and to tell us who he is, what his financial resources are, or on what terms he proposes to invest.

Their scheme is nothing more than a rehash of what they proposed at the meeting with creditors and FSC on June 20, 1984—put them back in control of the board they abandoned and they will then disclose the identity of their mystery investor. Their "plan" speaks of an unnamed investor who is willing to buy an unstated number of FSC shares at an unstated price and who would merge his undisclosed businesses into FSC on unknown terms. This is exactly the type of loosely set deal Messrs. Garland and Ganassi arranged with the Portney-Powers group in September, 1981 that led directly to FSC's bankruptcy.

The thought that with its favorable tax attributes FSC could attract fresh funds and profitable businesses in conjunction with a plan or after FSC's emergence under a plan is hardly a new one. It has been employed in a number of bankruptcy cases around the nation and lies at the heart of FSC's plan. FSC has interviewed a number of possible investors who have expressed interest in FSC but who will not make proposals until, at the earliest, a definitive plan is proposed. In that regard the Debtor's management believes that it will be able to attract more favorable opportunities after it has been reorganized than while it is in the process of reorganiza-

tion. This is not to say that the Debtor is unwilling to entertain proposals now. However, it has been management's experience that conversations with potential investors can go no further than expressions of interest until FSC has a clean balance sheet and a fresh start. In these circumstances, for the Equity Committee to suggest that the track record of the Garland and Ganassi management team warrants the confidence of FSC's creditors in the ability of those gentlemen to attract new investors or businesses at this time is sheer folly. Of the nine companies that they have acquired for FSC, one was sold and the rest failed.

The "new" in the Equity Committee's plan is the proposed classification of claims and interests and distributions to them. While the "plan" is wholly lacking in concrete proposals as to who will get what and thus lacks the specificity Your Honor sought from the Equity Committee, it does purport (1) to lump together FSC and FSAM, (2) to deal with secured claims on a "few cents on the dollar" basis, and (3) to discriminate against and to subordinate those unsecured creditors holding guaranty claims to FSC's existing equity holders who are to continue to hold their shares. The problems attendant to simply lumping FSC and FSAM together are described in our Summary; it is enough here to note that such a plan wholly ignores the separate and conflicing interests of FSAM's creditors. Treatment of secured claims (which we believe reside only in FSAM's case) in the fashion proposed by the Equity Committee is nothing short of cavalier. At the very least, one would expect the Equity Committee to' appreciate that to the extent the secured claimant's collateral is insufficient to cover his claim, he will have an unsecured claim, entitled to treatment *pari passu* with the unsecured creditors.

Perhaps the most outrageous aspect of the Equity Committee's "plan" is its proposed treatment of holders of FSC guarantees, who, as holders of guarantees are unsecured creditors of FSC. If this "plan" were presented for a vote to these unsecured creditors they would surely reject it and they would have every reason to do so because it would both unlawfully attempt to subordinate their claims to the interests of equity holders and unfairly discriminate against them and in favor of other unsecured creditors who would receive "X dollars" in cash and "X shares" of FSC common stock. Under those circumstances the plan could not be confirmed by the Court because it would be both discriminatory and violative of the principal [sic] of absolute priority embodied in Section 1129(b) of the Bankruptcy Code.

In sum, the Equity Committee's "plan" is not a plan but a smokescreen thrown up in an effort to hide the attempt by Messrs. Garland and Ganassi to regain control of FSC. It brings forth the "old"—the mysterious investor, a Trojan horse as enshrouded today as he has been in the past, and it presents something "new"—a plan of distribution which because it cannot be confirmed renders it a dead letter from the start.

Respectfully yours,

/s/ Michael A. Snyder
Michael A. Snyder

MAS/mal

Under the criteria set forth in *Post*, we hold that the letter at issue here was "pertinent and material" to the proposed course the District Court would pursue in FSC's bankruptcy, *and*, moreover, the letter was issued in the "regular course" of the proceedings in that it was prepared in reply to the District Court's request for input from those having an interest in FSC's bankruptcy. Accordingly, the letter is deemed a privileged communication entitling its author to protection from suit. See *Post*, supra.

■ As for Exhibits B, C and D, all of which are affidavits filed in Bankruptcy Court,[4] we rule that each is a

---

cc: Lawrence N. Ravick, Esq.
Alan Z. Lefkowitz, Esq.
William M. Kahn, Esq.
John A. Tumolo, Esq.

4. Exhibit B reads:
IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
Bankruptcy No. 81–2558
IN RE:
FSC CORPORATION,
Debtor.
AFFIDAVIT IN SUPPORT OF ANSWER OF DEBTOR TO PETITION OF EQUITY SECURITY HOLDERS TO VACATE AND PETITION TO MODIFY ORDER OF APRIL 19, 1982
Having been duly sworn before the undersigned authority, personally appeared RICHARD J. UHL, who does depose and say that he is the designated responsible officer of FSC Corporation, debtor-in-possession and in September, 1981, was the Senior Vice President of FSC Corporation ("FSC").
I do further depose and say that on September 16, 1981, Stanley B. Scheinman, then President of FSC, telephoned me at approximately 5:00 p.m. and instructed me to assemble officers of FSC Corporation and others for a meeting at 6:00 p.m. at FSC's Pittsburgh offices. Mr. Scheinman stated that he and Mr. G. Gray Garland, Jr., Chairman of the Board of Directors of FSC had something important to tell us all.
I do further depose and say that at said meeting Mr. Scheinman and Mr. Garland announced that a new Board of Directors had been appointed and the former Board members had all resigned and that Mr. Garland and Floyd Ganassi had sold a major portion of their stock in FSC for nominal consideration to a group headed by Mr. Lawrence Powers and Mr. Allen Portnoy.
I do further depose and say that Mr. Garland stated that the new shareholders would bring to FSC $5—$10 million. I asked Mr. Garland if he had performed sufficient review of the financial

capability of the new shareholders to assure that they were capable of making the $5—$10 million investment. Mr. Garland responded in the affirmative. Mr. Harold Lehman asked Mr. Garland if there were any conditions attached to the $10 million financing. Mr. Garland responded that there were no conditions precedent to the new group "putting $5 to $10 million" into FSC.

I do further depose and say that on September 23, 1981, Stanley B. Scheinman telephoned me at approximately 8:00 p.m. to inform me that he believed that Mr. Portnoy, Mr. Powers and their group were rescinding the agreement and were resigning as directors of FSC.

I do further depose and say that on September 24, 1981, at approximately 12:45 p.m., Stanley B. Scheinman telephoned me and stated that he had been informed by Mr. Powers, that Powers and his group were rescinding all arrangements. Mr. Scheinman further stated that Mr. Garland had received a telex rescinding the stock purchase and all related contracts and a proposal to reinstate all former directors.

I do further depose and say that on September 24, 1981, at approximately 3:50 p.m., Mr. Portnoy informed me that he was rescinding the agreement and that he and the other members of the Board of Directors of FSC had resigned.

I do further depose and say that on September 25, 1981, at approximately 9:30 a.m., Mr. Garland informed me that he probably would accept Portnoy's rescission, but that he had not as yet decided to do so. At that time, Mr. Garland further informed me that he had visited with an officer of Equibank and had suggested to him that Equibank consider filing a petition with the bankruptcy court.

I do further depose and say that to the best of my knowledge, after their resignations as officers and directors of FSC Corporation, neither Mr. Garland, Mr. Ganassi, Mr. Scheinman nor Mr. James Cooper ever accepted any offer from Mr. Powers or Mr. Portnoy to be reinstated as directors of FSC Corporation or otherwise accepted responsibility for the affairs of FSC prior to the commencement of its bankruptcy proceedings.

I do further depose that attached hereto is a true and correct copy of an "Agreement" dated September 16, 1981, which I received from Stanley B. Scheinman.

> /s/ Richard J. Uhl
> Richard J. Uhl

Exhibit C reads:

IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Bankruptcy No. 81–2558

IN RE:

FSC CORPORATION,

Debtor.

AFFIDAVIT OF PAUL M. WILLARD

Having been duly sworn before the undersigned authority, personally appeared Paul M. Willard, Esquire, who does depose and say that he is Vice President, Corporate Counsel of the Debtor, and in September, 1981, was Vice President, Corporate Counsel.

I do further depose and say that on September 16, 1981, at approximately 6:30 p.m., G. Gray Garland told me and others

present in the Board Room of FSC Corporation, that the Board of Directors had elected four new people to the Board and had simultaneously resigned. The new board was described as four (4) individuals that were also the senior management of Spartan Manufacturing Corporation. Mr. Garland indicated that not only would this new group put in $5—$10 million dollars in cash as new capital to solve our current financial crises but also bring with them the experience they had in reorganizing a financially troubled company, as they had with Spartan Manufacturing Corporation. Mr. Garland stated that Allen Portnoy would serve as a new director as well as President and Chief Executive Officer, Lawrence Powers was the new Chairman of the Board of Directors, Martin Green was the new General Counsel and Secretary and C.A. Mitts was a director and Vice President–Finance. On or about September 24, 1981, I was shown a copy of an FSC news release issued by Mr. Green in which he was quoted as saying "... following the signing of the acquisition documents, and our election as directors, but prior to the final closing, we discovered a multitude of financial and legal problems which had not been previously disclosed and would severely retard our efforts to revive this financially troubled company. As a result the entire transaction has been rescinded. The new group of directors has resigned and has informed the prior board, consisting of G. Gray Garland, Jr., Floyd R. Ganassi, James W. Cooper and Stanley B. Scheinman that they should be reinstated as directors of the company ..."

To the best of my knowledge, on or after September 16, 1981, Messrs. Garland, Ganassi, Cooper or Scheinman never acted or purported to act in the capacity of an officer or director of FSC Corporation or any of its subsidiaries.

/s/ Paul M. Willard
Paul M. Willard

Exhibit D reads:

IN THE UNITED STATES BANKRUPTCY COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

No. 81–2558
IN RE:
FSC CORPORATION,

Debtor.

AFFIDAVIT OF M. BRUCE McCULLOUGH IN SUPPORT OF REPLY OF DEBTOR TO THE PETITION TO VACATE ORDER OF APRIL 19, 1982 FILED IN ADDITION TO THE PETITION TO MODIFY THE ORDER OF APRIL 19, 1982

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF ALLEGHENY

AND NOW comes M. Bruce McCullough, after first being duly sworn, who states as follows:

1. I, M. Bruce McCullough, am a partner in the office of Buchanan Ingersoll Professional Corporation, and with that office have served as counsel for the Debtor since the filing of Debtor's Petition for Relief.

2. Shortly after the granting of the Petition for Relief, counsel for the Equity Security Holders' Committee, Bernhard H. Schaffler,

statement made in the course of a judicial proceeding, and, therefore, cannot give rise to an action for defamation. See *Kemper v. Fort*, 219 Pa. 85, 88–90, 67 A. 991, 992–93 (1907); *B.B.C.I., Inc. v. Canada Dry Delaware Valley Bottling Co.*, 393 F.Supp. 299 (E.D.Pa.1975).

■ The last issue to be addressed concerns the plaintiffs' assertion that the court below erred in not granting them leave to amend their complaint.

Of record appears an amended complaint filed by the plaintiffs on June 21, 1985, which is over six (6) months after the original complaint was submitted to the prothonotary. However, there is no indication in the record filed with this Court that the court below ruled on the plaintiffs' requested amendment. The only insight we have as to the course pursued below is confined to the plaintiffs' brief. Therein, it is asserted that, as to the amended complaint, "no action was taken by the lower court even though it had at least two opportunities to do so; once at the hearing on the preliminary objections and when Appellants sent a letter to the court requested [sic] action (R. 52a and R. 68a, respectively)." (Plaintiffs' Brief at 20–21)

Esquire, secured from the Court a direction that he be notified prior to presentation of all motions before this Court.

3. For purposes of confirming on the record certain administrative matters, it was necessary to petition the Court to enter an Order authorizing Richard J. Uhl as the Responsible Officer to vote the shares of stock of the subsidiaries of the Debtor. The reasons therefor are more specifically set forth in the Answer of the Unsecured Creditors' Committee.

4. I am absolutely certain that before going to the Court with the Petition and Order that I contacted Bernhard H. Schaffler by phone and advised him of my intention. I advised him that the procedure was supported by the Unsecured Creditors' Committee.

5. I am certain that Mr. Schaffler advised me that he had no objection so long as I provided him with the copy of the Petition and executed Order.

6. By letter dated April 21, 1982, I provided Mr. Schaffler with a copy of the Petition and Order of April 19, 1982.

Of interest to this Court is the fact that Exhibit D makes no mention of the plaintiffs. Therefore, aside from the reasons mentioned infra for holding the Exhibits privileged, no evidence appears in this document which would lead one to conclude that it was intended to defame the plaintiffs.

We make mention of the method by which we have ascertained the course taken on this issue below because it appears only in the plaintiffs' brief, and, in this jurisdiction, such an issue is not cognizable in the form presented. See *McCormick v. Allegheny General Hospital,* 364 Pa.Super. 210, 527 A.2d 1028 (1987). Notwithstanding the deficiency in the record, the issue is equally not subject to review since, as a condition precedent to the court entering upon an inquiry and making a determination of whether prejudice would befall the opposing party if the late filing would be permitted, the plaintiffs have failed to show *sufficient cause* for the delay in filing the late pleading. See *Joyce v. Safeguard Mutual Insurance Co.,* 362 Pa.Super. 522, 524 A.2d 1362 (1987) (en banc), rev'd on other grounds 517 Pa. 488, 539 A.2d 340 (1988). As a result, the issue is found wanting and the requested relief is denied.

Order affirmed.