1999 PA Super 9

William and Bettye F. BAKER,
Appellants,

v.

CAMBRIDGE CHASE, INC., Pine Hill
Quality Custom Home, Inc., John C.
Shelton, Jr., Linda P. Boardman, Metzel
Corporation; Continental Bank, Mid-
Lantic National Bank, Commonwealth
Land Title Insurance Co., and Weichert
Realtors, Appellees.

Superior Court of Pennsylvania.

Argued Dec. 15, 1998.
Filed Jan. 14, 1999.
Reargument Denied March 19, 1999.

William J. Wheeler, Jr., Philadelphia, for appellants.

Thomas A. Fosnocht, Jr., West Chester, for Cambridge Chase, Inc., Pine Hill Qualtiy Custom Home, Inc., Shelton and Boardman, appellees.

Kevin H. Buraks, Blue Bell, for Metzel Corp., Continental Bank and Midlantic National Bank, appellees.

Gerald F. McCormick, Wayne, for Commonwealth Land Title, appellee.

Timothy L. Jones, Kennett Square, for Weichart Realtors, appellee.

Before JOHNSON and MONTEMURO *, JJ., and CIRILLO, President Judge Emeritus.

CIRILLO, President Judge Emeritus:

¶ 1 Mr. and Dr. Baker, plaintiffs below, appeal several pre-trial orders, some of which sustained preliminary objections to their amended complaint as to some defendants below, and some of which granted summary judgment as to the remaining defendants. We reverse and remand for trial against all defendants.

¶ 2 This case involves a fraudulent residential real estate transaction. All parties [1] agree on the following facts, with any relevant exceptions noted. An officer and/or officers of a Chester County real estate development corporation known as Cambridge Chase ("Cambridge") signed a construction agreement of sale for, and later delivered and recorded a deed erroneously purporting to convey title to an almost completed townhouse, Unit 202 at Cambridge Chase (also the name of the development Cambridge was developing), to the Bakers. The agreement of sale called for a special warranty deed, and the deed purported to be a special warranty deed.

¶ 3 At the time the deed was signed over to the buyers on behalf of Cambridge, Cambridge was not the owner of the property. This was due to the fact that either just before or just after signing the agreement of sale to the Bakers, Cambridge had signed a deed in lieu of foreclosure conveying the townhouse to Metzel Corporation.[2] The closing on the conveyance from Cambridge to the Bakers, which was conducted by Commonwealth, did not occur until after Cambridge had already deeded the townhouse to Metzel in a closing also conducted by Commonwealth. The Bakers' closing was held ten days after the deed from Cambridge to Metzel was recorded. At the Bakers' closing, Commonwealth indicated its title search showed the property belonged to Cambridge. Commonwealth insured the title on the Bakers' behalf.

---

* Retired Justice assigned to the Superior Court.

1. The Bakers named the following nine defendants, and three different judges of the Chester County Court of Common Pleas rendered the orders before us. We place the defendants in the following four groupings for clarity, noting which judge dealt with each group:

I. **Cambridge Chase, Inc.** ("Cambridge"), appears to have been the developer, or the corporate entity with general ownership of the land on which new homes and/or townhomes were built and the facilitator of sales. **Pine Hill Quality Custom Homes, Inc.** ("Pine Hill"), appears to be the general contracting company that built the town house under contract with Cambridge, although this is disputed. **John C. Shelton** ("Shelton") and **Linda Boardman** ("Boardman") are officers and directors of both Cambridge and Pine Hill. We refer to these four as "the Cambridge defendants." The Honorable Paula Francisco Ott issued all relevant orders as to the Cambridge defendants.

II. **Metzel Corporation** ("Metzel") is or was a wholly owned subsidiary of Continental Bank, and owned the townhouse after having taken a deed in lieu of foreclosure from Cambridge. **Continental Bank** ("Continental"), as owner of Metzel, owned the townhouse. It was also the mortgagee, or the holder of Cambridge's mortgage, on the townhouse before Cambridge deeded the townhouse to Metzel. Continental no longer exists as an independent entity but has been subsumed into MidLantic, together with,

we assume, Metzel. **MidLantic Bank** is the successor to MidLantic National Bank, which by merger took over Continental Bank. (We refer to both MidLantic Bank and MidLantic National Bank as "MidLantic.") Mindful that we are unaware of whether or not Metzel is or was primarily a financial institution, for purposes of clarity, we refer to these three (now represented by PNC, successor to MidLantic) as "the bank defendants." The Honorable James P. MacElree, II, issued all relevant orders as to the bank defendants.

III. **Weichert Realtors** ("Weichert") was the real estate agency acting on behalf of sellers, and/or on behalf of the bank defendants, and/or on behalf of the Cambridge defendants, in the transaction. The acting Weichert real estate agent was Helen Lackey, who is the mother of Cambridge defendant Boardman. Judge MacElree also issued all relevant orders as to Weichert.

IV. **Commonwealth Land Title Insurance Company** ("Commonwealth") insured the title to the property as per a contractual commitment and policy with the Bakers. The Honorable Thomas G. Gavin, President Judge, issued all relevant orders as to Commonwealth.

2. Metzel was and/or is a subsidiary of Continental Bank, the holder of Cambridge's mortgage note. It appears that Continental was shortly thereafter taken over by MidLantic, which itself changed names and was then taken over by PNC, by whom Metzel and the various banking entities are now represented.

¶ 4 The real estate agent representing the purported seller, Cambridge, and who had shown the property to the Bakers, was the mother of defendant Boardman, a Vice-President of Cambridge. At the time of the transaction, the Bakers were aware of this relationship.

¶ 5 Metzel had accepted the deed to Unit 202 in lieu of Continental's foreclosing on Cambridge's mortgage, which it appears had been unpaid and possibly in default for some time. At the time Cambridge signed the deed to the Bakers, Metzel and Continental knew that it was doing so. It appears these entities authorized Cambridge to sign on Metzel's behalf.

¶ 6 Despite being the owner, Metzel did not sign the deed to the Bakers. Likewise, Cambridge did not indicate to the Bakers that it did not own the property. The Bakers were under the reasonable but mistaken impression that the property was owned by Cambridge and that Cambridge had properly conveyed it to them.

¶ 7 Approximately a year after agreeing to buy the property, and well after they had moved into the townhouse, in the course of exploring the possibility of a lawsuit due to unfinished work on their home,[3] the Bakers learned their deed was ineffective. In March of 1994, immediately after learning of this problem, they contacted their title insurance company, Commonwealth. Commonwealth then obtained for the Bakers a quit-claim deed from Metzel, dated May 17, 1994, which was recorded on June 29, 1994.

¶ 8 In July of 1994, the Bakers instituted the present action against the nine defendants, stating various theories of liability against different combinations of the defendants. Approximately three years later, or approximately four years after the agreement of sale, Commonwealth obtained and duly recorded a special warranty deed from Metzel to the Bakers.

¶ 9 One reason that all original defendants were ultimately dismissed in the case, either by summary judgment or preliminary objections, appears to have been that the court believed damages were not pleaded properly. It is true that the circumstances do not, at least facially, support a claim of damages. The buyers continue to live in the townhouse they now own, and both a quit-claim deed and a special warranty deed passing title from Metzel to the Bakers have been recorded, albeit only well after the Bakers instituted the present action.[4] It appears to us that the buyers are requesting rescission of the "sale" or transaction in which they paid money to one party and received a deed four years later (and after this litigation had existed for some time) from a different party. They also appear to request restitution (both in equity and under their title insurance contract) for their attorney's fees and expenses during the approximately four years it has taken for them to obtain their good and marketable title, together with all associated expenses. Additionally, they request various damages, including punitive damages, delay damages, and interest.

¶ 10 In reviewing the propriety of the orders before us, we have the benefit not only of a brief opinion prepared for us by one of the judges involved in the case, the Honorable Paula Francisco Ott of the Chester County Court of Common Pleas, but also of brief statements included in some of the orders, explaining upon what grounds they were handed down.[5] On May 21, 1998,

---

3. Although a separate action was never commenced, two of the counts of both the original and amended complaints in the case before us involve this claim. Although these two counts were later discontinued by the Bakers, it is relevant to the questions before us here that the Bakers were dissatisfied with Cambridge's performance on its promise in the agreement of sale to finish their townhouse.

4. All appellees claim that the Bakers received the benefit of their bargain, i.e., fee simple title by way of a special warranty deed, when they received the 1994 quit-claim deed. This is incorrect, as a quit-claim deed conveys far less than a fee simple estate. See discussion infra.

5. For reference, the various orders in this case are as follows:

On **December 9, 1994,** the Honorable James P. MacElree, II, in two orders, sustained preliminary objections of the bank defendants and of Weichert to the original complaint, giving the Bakers 20 days to amend their pleadings (which they did). (These orders are not before us, but they form the basis for the following two orders, which are.)

Judge Ott granted summary judgment on the motion of the Cambridge defendants, the only remaining defendants at that time. In doing so, Judge Ott acknowledged there were two remaining counts against the Cambridge defendants. On June 1, 1998, counsel for the Bakers filed with the Prothonotary an "Order to Settle, Discontinue, and End" the remaining two claims. It was this administrative filing that finally disposed of all claims and/or parties. Two days later, the Bakers filed this appeal.

¶ 11 Appellants, the Bakers, present the following issues for our review:

(1) Did the trial court ("Court") err, in a real estate transaction involving fraud, in granting preliminary objections where a Quit Claim deed was used to cure a title defect and where plaintiffs had bargained for a FEE SIMPLE DEED OF SPECIAL WARRANTY?

(2) Did [the] Court err in granting Summary Judgment Motions where there were genuine issues of material fact in dispute?

(3) Whether Plaintiffs are entitled to Rescission and Restitution where fraud is involved in the real estate transaction?

(4) Did the Court err in denying plaintiffs' contractual rights to recover their out of pocket costs as damages for obtaining the Quit Claim and Warranty deeds?

(5) Did the Court err in denying the Petition for Reconsideration?

(6) Whether the Quit Claim and Warranty deeds are invalid due to fraud?

(7) Did the Court err when it concluded that there were no damages where there was evidence of damages apart from "rescission and restitution"?

(8) Did the Court err in its determination that plaintiffs' title has been continuously insured in fee simple and that there was not a threat to the title?

(9) Did the Court err in its determination that "rescission" was not pleaded?

(10) Did the Court err in its opinion that plaintiffs have not timely appealed previous judges['] orders and that the Notice of Appeal stated "only" the May 21, 1998 order was being appealed and "not the prior orders"?

¶ 12 Before we may proceed further, we must clarify exactly who and what is before us, disposing of the Bakers' last issue first. We must determine whether the notice of appeal was filed from Judge Ott's order

On **February 17, 1995**, Judge MacElree sustained the bank defendants' preliminary objections and dismissed the Bakers' amended complaint as to the bank with prejudice.

On **March 2, 1995**, Judge MacElree sustained Weichert's preliminary objections and dismissed the amended complaint as to Weichert.

On **April 12, 1995**, Judge MacElree issued an order in response to the Bakers' March 14, 1995 Motion for Determination of Finality, finding · that his order of February 16, 1995 was not final for purposes of appeal, since more than thirty days had elapsed. (Although this order is not before us, it is relevant and will be discussed in our analysis of the contested issues of finality for purposes of appeal.)

On **July 22, 1996**, the Honorable Thomas G. Gavin, President Judge, denied defendant Commonwealth's motion for summary judgment.

On **September 13, 1996**, Judge Gavin granted the Bakers' motion to compel production of documents directed to defendant Commonwealth. (This order is not before us, but it is relevant.)

On **December 11, 1997**, Judge Gavin granted summary judgment in favor of defendant Commonwealth.

On **February 9, 1998**, Judge Gavin denied the Bakers' reconsideration petition.

On **March 4, 1998**, the Honorable Paula Francisco Ott denied the Bakers' motion to compel production of documents as to the Cambridge defendants for failure to comply with a local court rule (C.C.R.C.P. 206.1(A)(1)(b)) apparently regarding the obligation to consult with opposing counsel. She added that the Cambridge defendants had twenty days to file a motion for summary judgment and/or a motion *in limine*. They filed both promptly.

On **May 21, 1998**, Judge Ott granted summary judgment in favor of the Cambridge defendants (the only remaining defendants) as to all counts but two. By the same order, she granted a motion *in limine* in preparation for trial. In a different order of the same date, Judge Ott denied Plaintiff's second motion to compel production of documents.

On **June 1, 1998**, in an administrative filing directed to the Chester County Prothonotary, the Bakers discontinued the two remaining counts as to the Cambridge defendants.

granting partial summary judgment, and/or from three prior orders of two different judges, and/or from plaintiff's "Order to Settle, Discontinue, and End." The three prior orders effectively terminated the litigation as to the various defendants in whose favor they ruled. Judge Ott and several defendants/appellees conclude for several reasons that the Bakers have not appealed these prior orders, but only Judge Ott's partial summary judgment order. If this is true, they claim, only the Cambridge defendants are before us, and the others are no longer parties to this matter.

¶ 13 The first reason offered for this conclusion is that the time period for appealing the prior orders had expired by the time the Bakers filed this appeal. We disagree. Pennsylvania Rule of Appellate Procedure 341 states that an appeal may be taken from a final order. The rule defines a "final order" as "any order that: (1) disposes of all claims and of all parties; or (2) any order that is expressly defined as a final order by statute; or (3) any order entered as a final order pursuant to subdivision (c) of this rule." Pa.R.A.P. 341(a), 42 Pa.C.S. Subdivision (c) allows the court to designate an order as final even when it does not dispose of all claims and/or parties. It also contains the following caveat: "In the absence of such a determination and entry of a final order, any order **or other form of decision** that adjudicates fewer than all the claims and parties shall not constitute a final order." Pa.R.A.P. 341(c) (emphasis added). Rule 341 applies to this case. *See Zikria v. Ass'n of T. & C. Surgeons*, 432 Pa.Super. 248, 637 A.2d 1367 (1994) (amended Rule 341 applies to orders entered in matters commenced after July 6, 1992, and to all orders entered on or after March 1, 1994, regardless of when proceedings commenced).[6]

¶ 14 Rule 341 rendered the prior orders herein final only as of June 1, 1998, when the Bakers' "Order to Settle, Discontinue, and End" had the effect of withdrawing the two remaining claims against the four remaining parties. Prior to that date, no orders were final, because all claims and/or parties had not yet been adjudicated or dismissed. *Jobe v. W.P. Metz Refining*, 445 Pa.Super. 76, 664 A.2d 1015, 1017 n. 3 (1995).

¶ 15 On June 3, 1998, the Bakers filed the following Notice of Appeal:

> Notice is hereby given that William Baker and Bettye F. Baker, Plaintiffs, above named, hereby appeal to the Superior Court of Pennsylvania from the Summary Judgment Order dismissing Counts III, VI, IX, X, and XI of Plaintiffs' Amended Complaint entered in this matter on the 21st day of May, 1998 by the Honorable Judge Paula Francisco Ott. Said Order became final on June 1, 1998 when Plaintiffs filed an Order to Settle, Discontinue and End involving the remaining Counts XIV and XV of the Amended Complaint. Pa.R.A.P. 341. This Order to Settle, Discontinue and End has been entered in the Docket as evidenced by the attached copy of the Docket entry.

¶ 16 We agree that Judge Ott's order of May 21, 1998 did not become final until June 1, 1998.[7] The Bakers therefore had thirty days, or until July 1, 1998, to file a notice of appeal. Their June 3, 1998 notice was timely. We thus reject the first reason for finding waiver of appellate rights as to the prior orders.[8]

---

**6.** In fact, the Bakers did timely file an application for determination of finality under Rule 341(c), requesting that the court designate as final its first order sustaining the bank defendants' preliminary objections to the Bakers' amended complaint. This motion was denied.

**7.** Recognizing that it appears improper to allow an appellant to appeal from an "order" which he, and not a judge, has "entered," we clarify that the June 1, 1998 "order" filed with the Prothonotary by counsel for the Bakers was in reality a routine withdrawal of claims and/or parties and was an "other form of decision"
under Rule 341(c), *supra*. Appeal was properly taken from Judge Ott's order, dated May 21, 1998, which became final on June 1, 1998, as the Bakers stated.

**8.** We also reject the argument of various appellees that the explicit language of the notice of appeal states that appellant takes appeal only from certain counts of the complaint. We find the notice of appeal mentions counts only for the limited purpose of describing the order from which appeal was taken.

¶ 17 Secondly, we are urged to conclude that the orders prior to that of May 21, 1998 are not before us because there has been no separate notice of appeal as to each order (i.e., effectively, as to each group of defendants). Although there are cases that support this position, a careful reading of them reveals they are either limited to a procedural posture that does not apply to this case, or are cases of the Commonwealth Court by which we are not bound.

¶ 18 The Comment to Pennsylvania Rule of Appellate Procedure 512, "Joint Appeals," states: "The rule continues the policy that 'taking one appeal from several judgments is not acceptable practice and is discouraged.' *General Electric Credit Corp. v. Aetna Casualty and Surety Co.*, 437 Pa. 463, 469, 263 A.2d 448, 452 (1970)." However, Rule 512 regards consolidation of multiple cases on appeal where the grounds on appeal are similar, and, in this court, the comment is only applied to that situation. The rationale for this was well explicated in *Romanovich v. Hilferty*, 212 Pa.Super. 570, 245 A.2d 701 (1968):

> The joinder is purely procedural, not substantive, and the two rights of action do not merge but remain separate and distinct.... In cases consolidated for trial, verdicts and judgments remain separate in character. Separate appeals should be taken from each judgment.

*Id.*, 245 A.2d at 703 (citations omitted). Because there was no joinder or consolidation here, there is nothing "separate in character" here; there is no need to apply the rule to the case before us. We acknowledge that in 1995, the Commonwealth Court went further when it established a policy of quashing single appeals from all multiple orders, not just in cases where there had been joinder or consolidation. *Croft v. Unemployment Compensation Board of Review*, 662 A.2d 24 (Pa. Commw.1995). However, this court has taken no such step. We decline to do so now.

¶ 19 It is true that *General Electric* and several other cases contain several *dicta* statements that apparently support the notion that a similar rule applies to all such cases as this, in which multiple, otherwise final orders have been entered dismissing different defendants at different times. We find such statements of *dicta* inapplicable here. We also find that, in this court, this rule does not apply where there has been no consolidation or joinder. Before us we have one action from start to finish with multiple defendants who were released and dismissed in a piecemeal fashion. There is no joinder here.

¶ 20 Furthermore, when faced with a similar situation, the Commonwealth Court allowed an appellant to raise issues involving an earlier entry of summary judgment against a different party, which had not become final until entry of the order from which the appeal was taken. *See Ballod v. Dept. of Corrections*, 676 A.2d 1333 n. 1 (Pa.Commw.1996).

¶ 21 Our supreme court noted in *General Electric* that even in cases where there has been a joinder or consolidation, we look primarily to equity when considering whether a procedural defect in the form of appeal from a pre-trial order should be held finally to put parties out of court. *Id.* at 470 n. 6, 263 A.2d at 453 n. 6.[9] In this case, even if we were to consider the failure to file separate notices of appeal to be a procedural defect (which we do not), it would not be fair to find the orders prior to May 21, 1998 were not appealed. The Bakers named all original defendants in the caption of their notice of appeal. We find, therefore, that the various orders from 1994 to 1998 sustaining preliminary objections and granting summary judgments as to all nine defendants/appellees are properly be-

---

9. Given the procedural complexity of this case, it may have been better practice for the Bakers to have included a statement in their single notice of appeal that they were appealing the other dated orders which they wished to include on appeal, or to have filed one simple notice of appeal without reference to any dated orders. However, their notice of appeal included all named defendants in its caption. Earlier, they had timely requested that the court designate as final under Rule 341(c) its first order sustaining preliminary objections in response to their amended complaint. This request was denied. We do not find that the Bakers' chosen wording in their notice of appeal, or the fact that they filed one rather than many notices of appeal, should be held against them under these circumstances.

fore us. Having done so, we turn to the standards by which we must substantively review each order.

¶ 22 Our standards of review are well settled. Preliminary objections are properly granted when the pleadings are legally insufficient for one or more of several reasons enumerated in Rule of Civil Procedure Rule 1028, three of which have application to this case:

> (2) failure of a pleading to conform to law or rule of court . . . ;
>
> (3) insufficient specificity in a pleading; [or]
>
> (4) legal insufficiency of a pleading (demurrer)[.]

Pa.R.C.P. 1028(a)(2), (3), and (4), 42 Pa.C.S. In general, where upholding a grant of preliminary objections would result in the dismissal of the action, we are called upon to do so only in cases which are clear and free from doubt. *Ambrose v. Cross Creek Condominiums*, 412 Pa.Super. 1, 602 A.2d 864 (1992). Additionally, in *Keech v. Mead Johnson & Co.*, 398 Pa.Super. 329, 580 A.2d 1374 (1990), this court observed:

> [U]pon an appeal from a decision of the court below sustaining preliminary objections in the nature of a demurrer, we must accept as true every relevant fact sufficiently averred in the plaintiffs' complaint together with every inference favorable to the non-moving party which is fairly deductible therefrom.

*Id.*, 580 A.2d at 1375 (quoting *Ganassi v. Buchanan Ingersoll, P.C.*, 373 Pa.Super. 9, 540 A.2d 272, 273 (1988) (citations omitted)). However, "[t]he pleader's conclusions or averments of law are not considered to be admitted as true by a demurrer." *Graham v. Harleysville Ins. Co.*, 429 Pa.Super. 444, 632 A.2d 939, 940 (1993) (citing *Savitz v. Weinstein*, 395 Pa. 173, 149 A.2d 110 (1959)).

> Since the sustaining of a demurrer results in a denial of a pleader's claim or a dismissal of his suit, a preliminary objection in the nature of a demurrer should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted. If the facts as pleaded state a claim for which relief may be granted under any theory of law, then there is sufficient doubt to require the preliminary objection in the nature of a demurrer to be rejected.

*Id.* (quoting *County of Allegheny v. Commonwealth of Pennsylvania*, 507 Pa. 360, 372, 490 A.2d 402, 408 (1985)).

¶ 23 Our standard of review when reviewing an order granting summary judgment is also well settled. Summary judgment is proper when all the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Pa.R.C.P. 1035.2, 42 Pa. C.S.A. This court will only reverse a trial court's entry of summary judgment where we find an abuse of discretion or an error of law. *Merriweather v. Philadelphia Newspapers, Inc.*, 453 Pa.Super. 464, 684 A.2d 137, 140 (1996); *Myers v. McHenry*, 398 Pa.Super. 100, 580 A.2d 860, 861 (1990). In determining whether to grant summary judgment, a trial court must resolve all doubts against the moving party and examine the record in the light most favorable to the non-moving party. *Id.* Summary judgment may only be granted in cases where it is clear and free from doubt the moving party is entitled to judgment as a matter of law. *Id.*

¶ 24 Turning to the orders and pleadings, and applying the proper legal standards as stated above, we find the pleadings do make out sufficient facts to state claims for which relief may be granted.

¶ 25 The Bakers filed an original complaint. Shortly thereafter, the court sustained preliminary objections from Weichert and the bank defendants. The Bakers then timely filed an amended complaint. Thereupon, the court granted the bank defendants' preliminary objections to the Bakers' amended complaint, and, shortly thereafter, it granted Weichert's preliminary objections.[10]

¶ 26 The preliminary objections of Weichert and the bank defendants to the amend-

---

10. These orders, together with a denial of the Bakers' Motion for Determination of Finality, were the only ones issued by Judge MacElree. We therefore treat them together.

ed complaint are essentially the same as those they had filed to the original complaint. Indeed, the amended complaint is not a great deal different than the original one. However, neither Judge MacElree's first nor his second orders sustaining preliminary objections to the original and amended complaints, sets forth his reasons for sustaining preliminary objections. Thus, it is not clear to us whether the Bakers in their amended complaint had addressed the defects which caused the original grant of preliminary objections, for it is not clear what these defects might be. Judge Ott's order and opinion later granting summary judgment for the remaining defendants, likewise, does not attempt to elucidate Judge MacElree's earlier orders dismissing the Bakers' amended complaint as to the bank defendants and Weichert. We are left without any record explanation for them, aside from the pleadings themselves.[11]

¶ 27 On February 17, 1995, when the court sustained preliminary objections as to Weichert and the bank defendants, the amended complaint fairly made out claims including fraud by (intentional or negligent) misrepresentation, breach of contract (including against the bank defendants on whose behalf, it was alleged, Boardman had signed the fraudulent deed), violation of the Uniform Trade Practices and Consumer Protection Law (UTPCPL) (73 P.S. § 201-1 *et seq.*), and negligence against the various defendants in different combinations. Reviewing the record in the light most favorable to the Bakers, we find they had alleged sufficient facts to show that all defendants knew that the property was not owned by Cambridge at the time it was purportedly conveyed to the Bakers, that all parties were aware of the fraudulent conveyance to the Bakers when it oc-

curred, and that none of the defendants had informed the Bakers that the party was not owned by Cambridge.

¶ 28 Factually and specifically, the Bakers' amended complaint[12] alleged that at the time of Cambridge's fraudulent deed to the Bakers, all defendants knew or should have known that Metzel, and not Cambridge, owned the townhouse; that all defendants should have revealed this to the Bakers; and that none of the defendants revealed it to the Bakers, to the Bakers' detriment. It asserted that all defendants had acted or attempted to act on behalf of the bank defendants in defrauding them by taking their money and giving them only equitable, not legal, title. It alleged that, whether through a direct breach of contract or through a duty imposed by way of agency, all defendants had owed and breached a duty to the Bakers to reveal not just the true ownership of the house, but also, after the Bakers had inquired about it, the financial situation and stability of Cambridge. By their inquiry, the Bakers made it known that the builder/developer's financial stability was a material condition to their purchase of an unfinished house shortly to be completed by that builder. The Bakers alleged that as a result of the defendants' behavior, in return for full cash consideration, they received no legal title to, but only physical possession of, an unfinished town house to be finished by a builder in financial difficulties. However, they alleged, they had bargained for fee simple title to a town house shortly to be finished by a builder/developer represented to be in good financial condition.

¶ 29 Before proceeding to review individually the orders sustaining preliminary objections and granting summary judgment for the various combinations of defendants, we

---

11. It appears from the record that oral argument was held on various occasions as to different issues in this case. There are no transcripts before us. There is an order entered on July 13, 1998 by Judge Ott stating, "No transcript is necessary for this appeal." However, to the extent that transcripts may have revealed the reasoning of the various judges' decisions, they might have assisted us.

12. We do not consider the last two counts of the complaint and the amended complaint, for the Bakers withdrew these on June 1, 1998, and they

are not before us. However, an awareness of these claims is germane to the Bakers' claim that, due to the increased risk posed by purchasing an only partially finished townhouse from a poorly funded developer/builder, they would not have purchased the townhouse from Cambridge, but for their reliance upon the representations made by Weichert and Cambridge that Cambridge was in solid financial condition. The two withdrawn claims involved failure to complete the townhouse and certain other allegedly tortious behaviors of the Cambridge defendants.

find it more efficient first to review one issue which is was raised by all defendants/appellees at various stages: that the Bakers' complaint is insufficient for failing properly to elect a remedy, and/or for failing to state damages.

¶ 30 The remedy requested by the Bakers' amended complaint is not explicit. However, they claimed fraud in the purchase of real estate, which automatically triggers the right to certain remedies, as will be discussed *infra*. Specifically, in the complaint, they demanded the purchase price of the town house, various expenses associated with the purchase and finishing of the house, and compensation for the loss of an option to extend the Bakers' balloon mortgage note's then-favorable interest rate, for an approximate total of $363,900.00.[13] Such demands appear to us to be in the nature of rescission and restitution.

¶ 31 However, also demanded in certain claims were punitive damages, attorney's fees, court costs, delay damages, and interest. The complaint's statement of losses, repeated *verbatim* in several counts, separates the cost of the house and the purchase expenses from the demand for punitive damages, fees, and other compensation. Appellees claim the Bakers' failure to elect on the one hand rescission, or damages on the other, is fatal to the complaint.

¶ 32 Rescission is an equitable remedy, to be granted only where the parties to a contract can be placed in their former positions with regard to the subject matter of the contract. *Sullivan v. Allegheny Ford Truck Sales, Inc.*, 283 Pa.Super. 351, 423 A.2d 1292 (1980). It is well known that the purpose of equitable rescission is to return the parties **as nearly as possible** to their original positions where warranted by the circumstances of the transaction. *Gilmore v. Northeast Dodge Co., Inc.*, 278 Pa.Super. 209, 420 A.2d 504, 507 (1980), *citing Fichera v. Gording*, 424 Pa. 404, 227 A.2d 642 (1967) (emphasis added).

¶ 33 Therefore, restitution often goes with rescission, and should not be characterized as damages, as appellees attempt to do. In fact, this precise issue is not new to this court. In *Boyle v. Odell*, 413 Pa.Super. 562, 605 A.2d 1260 (1992), a case involving a fraudulent conveyance of real property but not involving the UTPCPL, we stated:

> Assuming the trial court finds fraud by the defendant, or a breach of contract as alleged by the plaintiffs in the first count of their complaint, it clearly appears that the plaintiffs would have a right to obtain a rescission of the transaction, as well as a recovery of monies from the defendant.
>
> As discussed, if it is determined that a purchaser in a real estate transaction has suffered from fraud by the seller, even in the nature of an innocent misrepresentation of a material fact, a right of rescission is established. Moreover, the purchaser is given the election of remedies; he may seek to rescind the deed, or in the alternative, may sue for damages. A plaintiff in these circumstances seeking rescission may not also seek damages, as such remedies would be inconsistent. However, in addition to granting equitable relief, in the nature of rescission, the trial court is also empowered to grant the plaintiffs restitution of appropriate losses incurred. Restitution, unlike damages, is a remedy not inconsistent with rescission.

*Id.*, 605 A.2d at 1265 (citations omitted). *See Roberts v. Estate of Barbagallo*, 366 Pa.Super. 559, 531 A.2d 1125 (1987) (same). Thus, it is clear that if the Bakers are found to have made out a claim for rescission, they would also be entitled to restitution.

¶ 34 Further, the Bakers bring their fraud claim under the UTPCPL; they may, therefore, be entitled to treble damages and attorney's fees in addition to restitution, and they make demands for the same. Appellees object to this; but, again, we have recently addressed the precise issue. In the

---

**13.** Judge Ott's opinion characterizes the Bakers' amended complaint as not having demanded rescission and restitution, but rather only "liquidated money damages." We disagree with this conclusion for reasons stated *infra* and note that all dollar figures detailed in the Bakers' complaint were based on rescission and restitution alone (including compensation for attorney's fees as part of restitution).

recent case of *Metz v. Quaker Highlands, Inc.*, 714 A.2d 447 (Pa.Super.1998), upon finding fraud under the UTPCPL, the trial court trebled the purchase price of the lot and awarded attorney's fees, even though the buyers had already elected rescission. This court affirmed the trial court, quoting its rationale approvingly:

> The defendant filed an appeal restricted to a challenge of treble damages on grounds that once a rescission of the sales contract occurred, the plaintiffs were not entitled to damages as well. On this point, the court below wrote:
>
>> Although Defendant's position that rescission is an alternative remedy to damages is correct as a general rule, it must be remembered that the damages contemplated in that context are contract damages. Treble damages under the UTPCPL are based on fraud. Fraud damages are not an alternative remedy to either contract damages or rescission of a contract. Fraud damages include a punitive element absent from those other remedies, as do the UTPCPL treble damages.
>>
>> The amount of restitution that would complete Plaintiffs' return to their previous position is therefore the correct amount to use under the UTPCPL where the breach, as here, results from fraud rather than mere non-performance.... The clear intent of the UTPCPL is to treble the actual money loss suffered as a result of a consumer-type fraud. The use of the word "damages" instead of "damages or restitution" cannot be meaningful, given the overall intent and purpose of the legislation.

*Id.*, 714 A.2d at 449. We agreed thoroughly with the trial court, finding not only that the choice of specific terminology is not determinative in this realm, but also that the remedies are not mutually exclusive in cases of real estate fraud which state claims under the UTPCPL:

> Albeit this case appears to be the first to address the issue posed, we find that the clear language of the UTPCPL allows an award of treble damages. This interpretation is consistent with statutory construction requiring laws unambiguous on their face be given full effect. 1 Pa.C.S.A. § 1921. We may not ignore entitlement to damages where statutorily provided. To hold to the contrary would eviscerate the unequivocal language of the UTPCPL permitting an award of treble damages, which makes no exclusion where rescission of a contract is granted as well. We are not persuaded to hold otherwise now.

*Id.*, 714 A.2d at 450. Therefore, we find no merit to the various appellees' election of remedies argument.[14]

¶ 35 Even assuming the UTPCPL claim did not dispose of this issue (which it does), we have found no cases in this Commonwealth clearly addressing the point made in the preliminary objections and briefs of the various defendants that a complaint which fails to elect one of these remedies over the other should be dismissed on preliminary objections because of this defect (whether on grounds of Pa.R.C.P. 1028(a)(2) (failure to conform to a rule of law in pleading), (a)(3) (insufficient specificity of pleading), or (a)(4) (demurrer)). It is clear to us, however, that strict "election of remedies" cases such as *Smith v. Brink*, 385 Pa.Super. 597, 561 A.2d 1253 (1989), cited by the Cambridge defendants, do not apply to the facts before us. They do not involve the special circumstance of real estate fraudulent conveyance.

¶ 36 In this connection, we find instructive the following commentary upon the cases of other jurisdictions:

> In several cases, a purchaser of real estate who has been defrauded or otherwise induced into entering into the purchase agreement has sought both damages and an order of rescission in the same action without having elected one remedy over

14. The words "rescission" or "restitution" were not used in the complaint itself, but, in light of the above discussion of the law, we do not find this determinative where real estate fraud is alleged. The word "restitution" was used in the exhibit detailing the expenses associated with purchase, and by requesting reimbursement for these expenses throughout their complaint, the Bakers clearly requested restitution.

the other. In some of these cases, the courts have taken the view that the purchaser may not pursue both claims, since they are inconsistent with each other, in that rescission involves the disaffirmance of the contract, whereas damages involve the affirmance of the contract, and thus the purchaser must make an election between the two remedies. In contrast, a number of courts have taken the view that a real-estate purchaser who has been defrauded into purchasing the real estate may pursue both remedies in the same action, notwithstanding that they are inconsistent with each other, subject to the rule that the purchaser does not obtain recovery under both theories. In some of these cases, the courts have supported their positions by pointing to modern rules of civil procedure which allow a party to plead inconsistent claims, as long as double recovery is not awarded.

Andrea G. Nadel, *Annotation: Necessity of Real-Estate Purchaser's Election Between Remedy of Rescission and Remedy of Damages for Fraud*, 40 A.L.R.4th 627, 632 (references omitted). In Pennsylvania, without reference to the UTPCPL, cases have held that both remedies may not be maintained simultaneously. *Boyle, supra* ; *Roberts, supra*. We know of no case, however, even in states that follow this same rule, in which a court dismissed a case merely due to the complainant's failure to elect one remedy over the other.

¶ 37 We find the Bakers' failure to elect a remedy in the complaint itself does not void the complaint. Therefore, to the extent that any of the orders before us are based upon the Bakers' failure to elect remedies or state specific damages, they are reversed.

¶ 38 Having disposed of the election of remedies claim common to the several defendants/appellees, we now turn to reviewing the various orders, under the legal standards stated above.[15]

¶ 39 Chronologically, the order as to the **bank defendants** was entered first, on February 17, 1995. The bank defendants' preliminary objections were in the form of a general demurrer, a separate claim that the complaint was not sufficiently specific, and certain procedural objections.[16] As to their general demurrer, they asserted essentially that they had no duty to the Bakers whatsoever, since there was neither privity of contract between the bank(s) and the Bakers, nor any relationship whatsoever. They stated the complaint had only vaguely and not specifically pled that the other defendants had acted as the bank's agents.[17]

¶ 40 As to the bank defendants, the amended complaint included an April 15, 1994 letter from Robert F. Amaral, Vice-President of MidLantic National Bank, addressed to Mr. Baker, stating that Continental had owned the premises since June of 1992, that MidLantic was the servicing agent for Continental and had managed the premises for Continental since September of 1993, and that Boardman had acted as Continental's agent in signing the deed. The letter also stated that by so signing, Boardman had transferred title for Unit 202 from Metzel to the Bakers.

¶ 41 The amended complaint asserted that despite the fact that the bank defendants knew both that Cambridge had severe financial problems and that Cambridge no longer possessed title, they did not disclose

---

15. We review the amended complaint and not the original complaint. It was from the amended complaint that the various defendants were dismissed by way of preliminary objection or summary judgment.

16. Their preliminary objections were, therefore, filed under Rule 1028(a)(2) (failure to conform to a rule of law in pleading), (a)(3) (insufficient specificity of pleading), and (a)(4) (demurrer). Their brief on appeal is based on demurrer and the procedural ground involving failure to appeal from each order that is resolved *supra*.

17. The bank defendants also noted that punitive damages are only available under the UTPCPL or for the tort of outrage (made out in the last two counts, later withdrawn, of the complaint) but had been sought in the complaint's other counts. Citing Pa.R.C.P. 1028(a)(3), they asserted the complaint's facts were not sufficiently specific. They also objected that the Bakers had sued the wrong corporate entity (since the bank(s) had since undergone change(s) of name) in violation of Pa.R.C.P. 2177, and that Bakers' complaint should be dismissed for failure to conform to that rule of court under Pa.R.C.P. 1028(a)(2).

this to the Bakers. The amended complaint fairly made out the claim that the bank defendants, as owners of the house who had authorized an agent to act on their behalf, had an affirmative duty to disclose the fact that Cambridge, the purported owner, did not in fact own the property. The complaint's assertion, and the letter's admission, that Ms. Boardman not only signed the deed as Vice–President of Cambridge, but also was at the same time acting as agent for the bank defendants, together clearly make out a claim that the bank should be liable as principal for its fraud.

¶ 42 Two cases of this court demonstrate that these facts as pled do state a claim on which relief can be granted, and that they are sufficiently specific.[18]

¶ 43 In *Roberts, supra,* we held that a real estate agent, acting as agent for the seller, was liable for failure to disclose the presence of urea formaldehyde foam insulation (UFFI) in a real estate transaction. We based liability on fraudulent concealment under section 550 of the Restatement, Second, of Torts, as well as on the well-settled concept that an agent can bind a principal.

¶ 44 Section 550 of the Restatement, Second, of Torts, Liability for Fraudulent Concealment, reads:

> One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.

*Roberts,* 531 A.2d at 1130. In *Roberts,* we noted that such "concealment or other action"

> may arise by: 1) the making of a knowingly false representation of fact; 2) an intentional concealment of true facts which is calculated to deceive the other party; or 3) a nonprivileged failure to disclose certain facts to the other party. *DeJoseph v. Zambelli,* 392 Pa. 24, 139 A.2d 644 (1958).

*Id.* We found there that although the seller, as principal, was unaware of the duty to disclose the presence of the UFFI insulation and thus had no independent liability to the buyer, the real estate brokerage, acting as agent, was aware of this duty and breached it intentionally. Since its agent had breached the duty, we found the seller liable as principal, quoting *Aiello v. Ed Saxe Real Estate,* 508 Pa. 553, 499 A.2d 282 (1985):

> [A] principal is liable to innocent third parties for the frauds, deceits, concealments, misrepresentations, torts, negligences and other malfeasances of his agent committed in the course of his employment, although the principal did not authorize, justify or participate in, or indeed know of, such misconduct, or even if he forbade the acts or disapproved of them.

*Id.*, 508 Pa. at 562, 499 A.2d at 287 (footnoted omitted) (quoted in *Roberts, supra,* 531 A.2d at 1132). *See Bortz v. Noon,* 698 A.2d 1311, 1317 (Pa.Super.1997) ("a party cannot hide behind the privity defense to shield itself from fraudulent misrepresentation liability.").

¶ 45 Here, the Bakers have pled that defendant Boardman was acting as the bank's agent, and that the bank had authorized her to sign on its behalf. They have also pled that the bank was bound by Boardman's actions in representing that Cambridge owned the townhouse and that, by implication, the bank did not. They have further pled that they inquired about the financial stability of Cambridge because this was a material condition of sale to them, since they were purchasing an unfinished house.

¶ 46 In *Sevin v. Kelshaw,* 417 Pa.Super. 1, 611 A.2d 1232 (1992), another real estate fraud case, we reviewed the elements of fraud: "1) a misrepresentation; 2) a fraudulent utterance of it; 3) the maker's intent that the recipient be induced thereby to act; 4) the recipient's justifiable reliance on the misrepresentation; and 5) damage to the recipient proximately caused." *Id.,* 611 A.2d at 1236.

---

18. In light of the various bank defendants' continuous changing of names and corporate entities throughout this litigation, we find no merit to their Rule 1028(a)(2) claim (by way of Rule 2177) that the Bakers had failed precisely to name the correct bank entity.

¶ 47  In that case, we also reviewed section 550 of the Restatement (Second) of Torts, adding that "[t]he concealment must be intentional and it must relate to material information. Mere silence in the absence of a duty to speak, however, cannot suffice to prove fraudulent concealment." *Id.*, 611 A.2d at 1236 (citing *Roberts, supra*; *Smith v. Renaut*, 387 Pa.Super. 299, 564 A.2d 188, 192 (1989)). Finally, we specified: "A misrepresentation is material if it is of such character that had it not been made, or in the present case, had it been made, the transaction would not have been consummated." *Id.*, 611 A.2d at 1237 (citing *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983)). The Bakers have alleged at least one such material misrepresentation on behalf of the bank.

¶ 48  Further, also in *Sevin, supra*, we reviewed the tort of negligent misrepresentation under section 552 of the Restatement (Second) of Torts:

> That section holds a person liable who, in the course of his business, profession or employment, supplies false information for the guidance of others in their business transactions, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.*, 611 A.2d at 1238. The pleadings appear to make out a claim against the bank under this section as well.

¶ 49  Suffice it to say that, upon reviewing the above law, and upon reviewing the amended complaint, we find demurrer inappropriate at this stage. The Bakers have, in a sufficiently specific fashion, alleged facts stating at least one claim upon which relief can be granted against the bank. Therefore, we reverse the order of February 17, 1995, reinstate the amended complaint as to the bank defendants, and remand for trial.

¶ 50  Preliminary objections were next sustained in favor of **Weichert**. Here, we have the benefit of a statement of reasons by the trial court for its decision. We address the trial court's statement of reasons first, after which we address the preliminary objections themselves.

¶ 51  The statement in essence concludes that because the Bakers "received title to the property from Defendant Metz[e]l on May 17, 1994, the Court fails to find any damages resulting from Plaintiffs' purchase of the home." The conclusion that the quit-claim deed conveyed title to the property has also been used by several other appellees herein. They state that since the Bakers had received the benefit of their bargain (by way of the quit-claim deed) prior to instituting suit, they had no damages.

¶ 52  We disagree with the trial court and with appellees that the quit-claim deed from Metzel to the Bakers, dated May 17, 1994, conveyed title to the property such that the contract had been fulfilled. When the Bakers had received the quit-claim deed, prior to instituting suit, they had not received the benefit of their bargain. It was only approximately three years after instituting suit that they received the benefit of their bargain, when they received a special warranty deed, constituting good and marketable title.

> Quit-claim deeds, long known to the law, are used when a party wishes to sell or otherwise convey an interest he may think he has in land but does not wish to warrant his title. It does not purport to convey anything more than the interest of the grantor at the time of its execution. 16 Am.Jur. p. 560, sec. 219: "The distinguishing characteristic of a quit-claim deed is that it is a conveyance of the interest or title of the grantor in and to the property described, rather than of the property itself."

*Greek Catholic Congregation v. Plummer*, 338 Pa. 373, 12 A.2d 435 (1940). It is clear that the Bakers had bargained in their agreement of sale for the following:

> 3.h.  Conveyance from seller will be by Fee Simple deed of Special Warranty.

A quit-claim deed is not a Fee Simple deed of Special Warranty. In fact, a quit-claim deed is "intended to pass any title, interest, or claim which the grantor may have in the premises, but not professing that such title is valid, nor containing any warranty or covenants for title." *Black's Law Dictionary*

1251 (6th ed.1990). The Bakers had, therefore, not received the benefit of their bargain before receiving the Special Warranty deed in 1997, approximately three years after instituting the present action.

¶ 53 We also disagree with the court's conclusion that because the Bakers had already received warranted title, they had no damages. In fact, they had not received the benefit of their bargain and only received it after paying an attorney to procure it for them. Furthermore, there was no necessity for the Bakers to plead damages of any kind, given that their complaint had established a right of rescission for fraud, as discussed above.

¶ 54 Having noted our disagreement with the trial court's statement of reasons for granting the preliminary objections, we turn to the objections themselves. The amended complaint's claims against Weichert were similar in nature to those against the bank defendants, but Weichert's preliminary objections were somewhat different than the bank defendants'. Weichert claimed it was under no duty to disclose Cambridge's financial status to the Bakers, that insufficient damages had been pleaded, that the integration clause in the agreement of sale had caused merger, and that since there was no mortgage contingency clause in the agreement of sale, Weichert had been unaware of any mortgage option. We need only consider whether the claims against Weichert in the Bakers' amended complaint fairly set forth any claim upon which relief may be granted.

¶ 55 We consider Weichert's integration clause argument first. Although it is true that the agreement of sale contains an integration clause, this is not necessarily determinative, in light of the fraud alleged. The clause, which is paragraph 21 of the agreement of sale, reads:

It is further understood that this Agreement contains the whole agreement between the Seller and the Buyer and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever concerning this sale. Furthermore, this Agreement shall not be altered, amended, changed, or modified except as in writing and fully executed by the parties hereto.

Weichert cites in its memorandum of law supporting its preliminary objections the case of *Bowman v. Meadow Ridge, Inc.*, 419 Pa.Super. 511, 615 A.2d 755 (1992) as authority for its position that the integration clause bars the evidence of fraudulent misrepresentation offered by the Bakers. In that same case, however, this court engaged in the following recitation of the rules of law governing whether claims of fraud are merged into an agreement containing an integration clause and are therefore barred by the parol evidence rule:

In *LeDonne [v. Kessler*, 256 Pa.Super. 280, 389 A.2d 1123 (1978) ], this court noted the following definition of the parol evidence rule:

Where the alleged prior or contemporaneous oral representations or agreement concern a subject which is specifically dealt with within the written contract, and the written contract covers or purports to cover the entire agreement of the parties, the law is now clearly and well settled that **in the absence of fraud**, accident or mistake, the alleged oral representations or agreements are merged in or superseded by the subsequent written contract, and parol evidence to vary, modify or supersede the written contract is inadmissible in evidence.

Appellants argue that evidence of the alleged fraudulent misrepresentation is admissible since they were induced to purchase the residence.... In *Myers [v. McHenry*, 398 Pa.Super. 100, 580 A.2d 860 (1990) ], we set forth the following test to be employed when deciding whether evidence of misrepresentation is excluded by the parol evidence rule:

Where buyers allege that they were fraudulently induced to purchase a property through fraud or misrepresentation, the applicability to the parol evidence rule is determined by balancing "the extent of the party's knowledge of objectionable conditions derived from a reasonable inspection against the extent of

the coverage of the contract's integration clause in order to determine whether the party could justifiably rely upon oral representations without insisting upon further contractual protection or the deletion of an overly broad integration clause." *LeDonne, supra,* [ ], 389 A.2d at 1130.

*Bowman, supra,* 615 A.2d at 758–59 (citations omitted) (emphasis added). The applicability of this passage is obvious. No balancing test has been applied here. The integration clause argument does not establish that the Bakers failed to state any claim on which relief can be granted. To the extent the court may have relied on this rationale in sustaining Weichert's preliminary objections regarding its knowledge of the ownership of Unit 202, it was in error.[19] Further, the parol evidence rule does not bar evidence that the sellers did not deliver fee simple title to the buyers, because that is indeed the essence of the agreement. If Weichert were found to have been acting as agent for the sellers, and if it were found to have had knowledge that the sellers could not pass title by virtue of already having sold it, the parol evidence rule would interpose no objection.

▆▆▆ ¶ 56 As to Weichert's relationship with the Bakers, Weichert states that it was acting as agent for Cambridge, the purported sellers. We do not necessarily accept this representation, but we find it sufficient to establish a relationship between Weichert as agents for the principals, Cambridge, who were parties to the contract. *Roberts, supra.* Having quoted the contract and admitted that it acted as the purported seller's agent, Weichert cannot now deny this. It is not clear to us whether Weichert was not also acting as agent for the owner of the property, Metzel (a subsidiary of Continental). This case presents a particularly interesting set of facts for the Bakers in that Helen Lackey, the Weichert agent, is the mother of Cambridge Vice–President Boardman, whom,

it has been admitted by the bank defendants, acted as the bank's agent. Whether Lackey, as mother of Boardman, might be held to have had a greater knowledge of Boardman's business than a stranger, including a knowledge of the true ownership of Unit 202 at the time of the "sale" to the Bakers, is a question that ought not be decided by way of preliminary objections.

¶ 57 Therefore, factually, and additionally for the same reasons as stated above with regard to the bank, we find the amended complaint did make out a claim on which relief could be granted against Weichert as to fraud. We need find only one claim on which relief may be granted in order to reverse, and we thus do not consider whether any other claims made by the Bakers as to Weichert have potential validity. We cannot state that, viewing the amended complaint in the light most favorable to the Bakers, and resolving all doubt in their favor, they have stated no claim whatsoever against Weichert upon which relief can be granted. Therefore, we reverse the March 2, 1995 order of the court, reinstate the amended complaint as to Weichert, and remand for trial.

¶ 58 We next consider the order of Judge Gavin, dated December 11, 1997, granting summary judgment in favor of **Commonwealth**. The claims stated against this defendant were breach of the title insurance contract and negligence including in performing the title search "bring-down."[20] Prior to granting this second motion for summary judgment, Judge Gavin had denied Commonwealth's first motion for summary judgment on July 22, 1996. In both orders, he provided a statement of his reasons.

¶ 59 Judge Gavin denied Commonwealth's first motion primarily on the following stated grounds:

In the instant case, Defendant has not met its burden of proof. Plaintiffs seek the return of the purchase price, costs incurred in settlement, and the value of an option which the Plaintiffs contend they

---

19. We make no comment as to the application of the parol evidence rule to the Bakers' claim regarding Helen Lackey's representation about the financial stability of Cambridge.

20. Upon Commonwealth's failure to produce the "bring-down," Judge Gavin granted the Bakers' motion to compel its production on September 13, 1996. However, no further information is in the record regarding this document.

are now unable to exercise. While I am unconvinced that the quit claim deed is a title defect, it is clear that Plaintiffs did not realize the benefit of the bargain into which they entered; i.e., Plaintiffs contracted for a warranty deed, yet received only a quit claim deed. Accordingly, Defendant's Motion for Summary Judgment is denied.

Judge Gavin granted the motion on December 11, 1997, stating:

However, the facts have since changed. On March 10, 1997[,] Commonwealth obtained and later had recorded a special warranty deed for the plaintiffs for the subject premises. The plaintiffs admit to this. Commonwealth now contends that, since the plaintiffs have suffered no damages arising out of any title defect, the entry of summary judgment is appropriate. I agree that the plaintiffs have received, with the special warranty deed, the benefit of their bargain.

Although we agree with Judge Gavin that the special warranty deed did give to the Bakers the essential benefit of their bargain with the sellers and/or owners of the property, we cannot agree that this disposes of the Bakers' claims against Commonwealth.

¶ 60 The policy under which Commonwealth insures the Bakers' title states essentially that, subject to several exclusions and with the maximum amount of $250,000, beginning on April 21, 1993, or the date of recording of the deed from Cambridge to the Bakers, Commonwealth ("the Company") insures against:

[L]oss or damage ... **and cost[s], attorneys' fees and expenses** which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

4. Unmarketability of such title.

(emphasis added) Schedule A states that specifically, Commonwealth insures the Bakers are taking a Fee Simple estate by the deed from Cambridge dated April 21, 1993. The exclusions section excludes claims for any

"[d]efects, liens, encumbrances, adverse claims, or other matters ... (c) resulting in no loss or damage to the insured claimant." The conditions section requires notice of loss to the company, which all agree was given by the Bakers, and it also contains the following paragraph:

**7. Limitation of Liability**

No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of the alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or **establishes the title, as insured, within a reasonable time after receipt of such notice;** (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals therefrom, adverse to the title, as insured, as provided in paragraph 3 hereof [referring to the Company's obligation to defend and prosecute actions on behalf of the insured]. . . .

(emphasis added)

¶ 61 Construing these policy provisions in the light most favorable to the Bakers, the Bakers discovered and reported the legal title "defect," that is to say, the complete absence of legal title, to Commonwealth in March of 1994. When, two months later, Commonwealth obtained a quit-claim deed from Metzel to the Bakers, they had not established the title as insured, as Judge Gavin noted. *See Greek Catholic Congregation, supra.* Only upon their delivering and later recording the special warranty deed, in 1997, did they establish the title as insured. This was three years, at a minimum, from the time Commonwealth received notice from the Bakers. Additionally, since the quit-claim deed did not establish the title, after Commonwealth had procured it for them, the Bakers instituted this action. Solely on the basis of the pleadings, it appears to this court that it was only through this litigation that the Bakers were able to obtain the title as insured from Commonwealth, a little less than three years after commencing suit.

¶ 62 Under the language of the contract, whether Commonwealth breached their duty to the Bakers must be answered

by resort to the question whether three years to establish the title as insured, is "within a reasonable time after receipt of such notice." There is no finding on this issue in Judge Gavin's grant of summary judgment for Commonwealth. We find it to be at the heart of the breach of contract claim.

¶ 63 In reviewing the grant of summary judgment, we review all the pleadings, together with discovery. The trial court must only grant summary judgment when clearly and beyond a doubt, the moving party is entitled to judgment as a matter of law. *Myers, supra.* At the time summary judgment was granted, the Bakers had, through discovery, uncovered information indicating that Commonwealth had conducted the settlement at which Cambridge had passed title to Metzel. Therefore, there is no need to inquire as to whether Commonwealth's failure at the Bakers' settlement to uncover the deed from Cambridge to Metzel, recorded ten days earlier, was negligent, for we have evidence that Commonwealth knew that the property had passed from Cambridge to Metzel.

¶ 64 Even without having conducted research on whether three years is a reasonable period of time to establish the title as insured under the cases of title insurance in this Commonwealth, we cannot state on these facts that Commonwealth was clearly and beyond doubt entitled to judgment as a matter of law. Therefore, we reverse the grant of summary judgment for Commonwealth dated December 11, 1997, reinstate the amended complaint as to it, and remand for trial.[21]

■ ¶ 65 Finally, as to the **Cambridge defendants**, Judge Ott granted summary judgment as to the only counts against them (apart from those later withdrawn by the Bakers) on May 21, 1998. Her statement of *reasons on the order reads in full:*

As President Judge Gavin has already determined that Plaintiffs have received the benefit of their bargain and have suffered no damages, under the "law of the case

doctrine," Defendants' Motion for Summary Judgment must be granted. *See* [ ] *Commonwealth v. Starr,* 541 Pa. 564, 664 A.2d 1326 (1995).

While we commend Judge Ott's attention to the principles of the law of the case doctrine, these principles do not nullify the obligation to reject decisions which are without support in the law. As was stated in *Starr* :

Departure from either of these principles [the coordinate jurisdiction rule or the law of the case doctrine, both now subsumed under the latter] is allowed only in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed.

*Id.* at 575–76, 664 A.2d at 1332. The trial court opinion provided by Judge Ott, as noted above, utilizes the term "money damages" throughout to describe the Bakers' requested relief. Her statement of reasons essentially restates the view that since the Bakers had suffered no damages, they are entitled to no relief. We have already addressed this conclusion in our discussion of election of remedies. When Judge Ott granted summary judgment for the Cambridge defendants, the Bakers had established through the pleading of fraud in a real estate transaction that they were at least entitled to rescission and restitution, if not treble damages and attorney's fees under the UTPCPA.

■ ¶ 66 The issue before Judge Ott, and before us, is whether there existed at that time no genuine issue of material fact and no doubt whatsoever that Cambridge was entitled to judgment as a matter of law. Judge Ott's grant of summary judgment for the Cambridge defendants would be proper if she had found no doubt on this issue, as she doubtless did. However, we do harbor doubts on the matter.

¶ 67 At the time, the Bakers had pled that Boardman signed the deed to them in her capacity as Vice–President of Cambridge,

---

21. Judge Gavin's order denying the Bakers' reconsideration petition as to this order rests entirely upon the issue of election of remedies, discussed *supra.*

as well as in her capacity as agent for the bank defendants. Cambridge had certainly signed over title to Metzel prior to signing it over to the Bakers. The Cambridge defendants steadfastly maintain that Boardman did this innocently and mistakenly. The Bakers' discovery includes material that would seem to support the view that this was not the case. Suffice it to say that this fact is material, goes to the heart of the fraud pled against Cambridge, and creates doubt. There are many other such material doubts as to the Cambridge defendants which should be resolved at trial, not by way of summary judgment. Therefore, we reverse the May 21, 1998 order granting summary judgment in favor of the Cambridge defendants, reinstate the amended complaint as to them, and remand for trial.

¶ 68 All pre-trial orders granting summary judgment or sustaining preliminary objections as to all defendants are reversed. The amended complaint is reinstated as to all original defendants, except for the final two counts voluntarily withdrawn by the Bakers. The case is remanded for trial against all defendants. Jurisdiction is relinquished.

